We'll hear argument first this morning in Case 16-1362, Encino Motorcars v. Navarro. Mr. Clement. Mr. Chief Justice, and may it please the Court, service advisers are salespeople primarily engaged in servicing automobiles. Service advisers are plainly salespeople, and what they sell and what they are primarily engaged in is the servicing of automobiles. Thus, Respondents and the nation's 100,000 service advisers come within the literal, disjunctive text of the FLSA exemption for any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements. That is the case. Ginsburg. Is there any other category? The statute lists three categories, salesman, partsman, and mechanics. And you say the service adviser is un – should fit under salesman. Is there any other person that's not specifically enumerated that's subsumed under one of these categories? There is, Justice Ginsburg, if what you mean is a sort of an occupation that was well understood at the time that Congress passed this exemption in 1966. The example would be automobile body repairment. That was treated as a separate category, for example, in the Occupational Outlook Handbook that my friends on the other side like so much. But yet the Labor Department has consistently treated repairmen in the body shop as covered by the exemption, just like mechanics in the service shop. So I think that goes a long way to showing that it's not like Congress was consulting this handbook at all or had this conception that it was going with a three-to-three I commend you said the literal meaning, and you have some good arguments, but I have to tell you I don't think that that's the best one of them. Just if you think of what servicing means, and this is one dictionary, but basically all dictionaries say the same thing, it means to perform services of maintenance, supply, repair, installation as to service a car. So it actually means to do the work, to do the repair, to do the maintenance. I think would be the most ordinary understanding of what servicing means. So it does seem as though for all the arguments that you do have, that one cuts against you, that, you know, just the ordinary meaning of what it means to be engaged in servicing automobiles is to be repairing, maintaining, fixing cars. Clements, Jr.: Well, Your Honor, I mean, I would love to talk to you about some of the other arguments you seem to like better, but let me try to push back a little bit on this one, which is I would be the first to admit that servicing in some statutes can have a relatively narrow compass and includes only, you know, essentially turning the wrenches yourself. But in other contexts, it can have a broader meaning, supplying the service, providing the service. And here we know that Congress used the term in that latter, broader sense because of the inclusion of partsmen, because partsmen are not engaged in getting under the hood and turning the wrenches. The best place to look at what a partsman does is the Labor Department regulation that's been on the books since 1970. It specifically talks about what a partsman is primarily engaged in, and that is the requisitioning, stocking and dispensing of parts. Kagan. Kagan. So I – that is one of the better arguments, I think, is what partsman is doing in this. But I think I'm still suggesting before we get on to that, that if you took partsman out of this statute, I don't really think that you'd have a leg to stand on here, that we would just naturally mean, well, servicing automobiles is like fixing them. And what – and these service providers, they have something to do with servicing, to be sure, but they're not doing the servicing. What they're doing is selling service products. Well, Your Honor, I think if partsmen were not in the statute, I would have a weaker argument. I think I still might have a leg to stand on, especially if there were four decades of industry reliance on a position. But I do think that the partsman can't be ignored, and I do think it's actually a mistake to sort of look at servicing in isolation from the inclusion of partsmen in the statute, because – Ginsburg If we look, Mr. Clement, at how partsmen got in there, I mean, there is the legislative history that Senator Bye said the partsmen are woken up at 4 in the morning because some piece of farm equipment needs to be repaired. And then there was somebody else who backed that up. So those Senators at least thought of the partsman as somebody who would work irregular hours. Now, they may not have – they may have been talking about a specific category of partsman, the ones who attend to farm equipment, but they use – the statute uses the general title. Clement Well, it does more than use the general title, Justice Ginsburg. It also – I think there's no argument that the statute only covers farm implement partsmen. Based on its disjunctive structure, it certainly covers, I think, automobile partsmen and partsmen at a truck dealership. And I think, equally importantly, it covers it without regard to whether they work outside or have unusual hours. And so I think what you have here is a classic example of where Congress was impelled to include partsmen in the statute based on some very specific concerns of specific Senators about farm dealer partsmen, but then they expanded the statute quite a bit more substantially to cover all of the partsmen. One other just footnote on that piece of the legislative action. I think it's actually interesting that when Congress first proposed adding partsmen, they proposed adding partsmen who were selling or servicing farm implements. And so I think what that shows is that Congress may have actually had with selling or servicing not necessarily two siloed disjunctive terms, but sort of the broader process of selling or servicing, because I don't think partsmen ever sold the farm implements themselves. Kagan One of the amicus briefs talks about what partsmen did historically and makes the case that what partsmen did when this statute was passed is a little bit different from what – or a lot different from what a partsman does now, in the sense that when this statute was passed, there were not readily available, ready-made, off-the-shelf parts. And what partsmen really did was kind of get under the hood and try to strip engines and play with parts and adjust parts, and, you know, it was very much more part of the repair process than somebody who was taking things off the shelf. Justice Kagan, I know there's an amicus brief that says that. I think, you know, we're here to ask you to mostly look at the plain text of the statute. But if you're interested in looking at something, I do think that occupational handbook from 1966 has a couple of pages about what partsmen did back then, and I don't think it really maps up with what the amicus brief says, which is to say, even back in 1966, sure, there might be an occasion on which they had to fix some part or got under the hood, but in the main, what they did then is exactly what the Labor Department identified, which is they're behind the counter, they're making sure that when you do a repair and you need a new spark plug or a new fan belt, that they actually have it in stock. And that is, I think, classically what a partsman does. I don't think that it really puts them really in the same place as the mechanics. I mean, it's interesting. If you want to look at those photos at the back of the red brief that come from that occupational handbook, I think it's telling that the service advisor and the mechanic are the two photos where the hood's up. The counterman, the partsman, he's behind the counter, which, you know, I don't mean to say that's where he or she belongs, but that is where they typically are, and it's pretty far removed from the action, which is why I think the partsmen really are the clue to interpreting this statute to have this broader compass of service. Kagan. Kagan. So can I try a hypothetical on you? And the hypothetical statute is designed to match this one in structure and to present the same question. So here's the language. Any salesman, designer, or seamstress primarily engaged in selling or making dresses? All right? So there, we know the seamstress is involved in making dresses. We know the salesman is involved in selling dresses. Designer is the partsman. And you could say, look, the designers, they're not actually sitting there with the needle, but they're still sort of making the dresses. That's the partsman. And then the question is, would you really say that the salesman is making the dresses, too? I'm not sure I would, Your Honor, but I think there are reasons for that, which is I think making dresses is a narrower term, frankly, than servicing. I think servicing is a broader term. I also think the designers are, frankly, more integral to the making of the dresses than the partsman is to any kind of narrow conception of servicing. That's exactly why I was interested when you say you're primarily relying on literally. Well, I think in 10 minutes, the two of us could think of hundreds of examples, maybe or at least 50, where it's just, look, any seamstress or customer who makes or wears dresses, hey, they don't mean the seamstress who wears dresses. They mean the customer who wears dresses and the seamstress makes the dresses. Any professor or student who teaches or learns at this university, they don't mean the professor who learns at the university. They mean the professor who teaches and the student who learns. Any salesman who, what's the word, you know, sells or sells cars or we see the word. But I think there's so many examples like that, that that seems to be the natural meaning. You have two words over here that are verbs, two words over here that are nouns. The first seems to go with the first, the second with the second. And if I just gave you this and you knew nothing else about it and you're just looking at the literal words, I would have thought on a bet you would have said that's the interpretation. Well, Justice Breyer, there's a couple of things. Most of the examples that you were suggesting, I think, have a two-to-two correspondence, not a three-to-two correspondence. And I do think that makes a big difference in the real world. The second thing is, I do think, I mean, I'm not here to tell you that there aren't disjunctive series followed by disjunctive series where you do have matching. Now, I think often that's because the matching really excludes the other cases or produces a null set. I think it also depends a little bit on sort of what's going on. With your professor and student hypothetical, if you do, you know, if that was all tethered to a requirement as to who gets issued a library card, if you had a professor who was sort of visiting that semester and only learning and not teaching, would they really deny him a library card? No, no, okay. But then you go to her second point, which the second point was, what about the purposes as Congress reveals them? You can see in that, sorry. Could I ask your indulgence, and just before you talk about purposes, just, you know, what my hypothetical was designed to do, and I came up with a bunch of them, and I'll spare you. Thank you. Is to have a three to two correspondence. Your answer back to Justice Breyer was right away, well, your hypotheticals have a two to two correspondence, and that's different. My hypothetical had a three to two correspondence, and you had to do a little bit of stretching to get one of the middle term in. But the question is, does that force you to stretch so much that you get the first term in when the first term pretty naturally pairs with the other, with the other. With the selling word. And that's what you're asking us to do. And I think to put the point more generally, the fact that you have to do a little bit of stretching to get partsman in does not compel you to do a lot of stretching to get salesman in. But, Justice Kagan, and I want to try to get back to the purpose of questions, but I do think that the degree of stretching you have to do to get partsman in is not a significant difference between how much stretching you have to do to get the service advisors in. And I think that's really the key. I mean, maybe in your hypothetical, which you designed a lot of them, and you probably gave me one of the best ones. And I think that's because... Now you're daring me. Well, no, but I take it that because you really thought there was a big gap between the designers and the salespeople in terms of the stretching. And I just don't think that's the case with the partsman. And I really do think. I mean, the partsman, I mean, God love the partsman, but they're pretty far removed from the action of turning the wrenches. I actually think that if you did an empirical test as to who got under the hood more often, the service advisors would win. Mr. Clement, one... Ginsburg. Why can't you say the partsman, they're exempt because Congress put them there specifically, and you don't have to match them with anything. I mean, Congress may have been overbroad because it started with the farm equipment people. So if we just look at the two others, why should we stretch service advisor to come within the mechanic who's actually servicing when we know that the service advisor doesn't even possess the skills to be engaged in servicing? So, Justice Ginsburg, I don't think the service advisor is differently situated from the partsman in terms of having the skills to go under the hood and turn the wrenches himself or herself. I think as to the answer to your question about why don't we just say, hey, the partsman are in because the partsman are in, because the structure of the statute doesn't let you say just the partsmen are in. The partsmen are in because they are primarily engaged in selling or servicing automobiles. Now, I take it that the partsmen don't sell the automobiles, so they must be in either because selling or servicing is just sort of a catchall that gets everything that the dealership basically does, or it's because we haven't brought enough conception of servicing to include the partsmen. Now, the way that I understand this Court to interpret statutes is once you interpret a statutory term to have a certain breadth, I mean, that's what it has. Even in, like, Clark v. Martinez, even when you have to stretch the language of the statute to avoid a constitutional problem. Kennedy, you have an example of a partsman that is not engaged in servicing automobiles, say a partsman in another office in downtown from the dealership and he just picks up the phone and orders parts or something? Sure. I mean, first of all, you could have a partsman who's not employed by an automobile dealership at all, that they're just an independent partsman or they work at AutoZone or something like that. I don't think they're covered by the terms of the statute. So I do think you have to interpret the statute so you tether partsmen to a term like servicing. And then once you interpret to have a certain breadth, I don't think it can shrink back down, so it can be wide as to partsmen but narrow as to service advisors. And so I do think then the service advisors do come comfortably within the text of the statute, and we haven't talked about the fact that for four decades they've been treated that way, which I think the Court has. Kennedy, I wanted to ask you, you mentioned in your argument that there's been decades of reliance. If we want to adopt that argument and say, well, there's been reliance here, it's a close question, we're not sure, it's ambiguous, what case do I cite to show that reliance bears on the interpretation of a statute? I think you'd cite, among other things, you could cite the Christopher case, the Christopher v. SmithKline case, which is another FLSA case. And this Court averted to the reliance interest, both in deciding not to apply our deference, but also in interpreting the statute. And I think the principle isn't, you know, well, if for four decades people have gotten wrong, we'll get it wrong. I think the principle is, you know, as the Seventh Circuit said in the Yee case, which Christopher cited, I mean, it's no mean feat to conclude that an agency has been an open, notorious violation of the FLSA for four decades. And I think the behavior of the industry is some evidence of what those terms meant. And the agency, as I understand it, the agency gave up after two circuits rejected its position. So the agency acquiesced in the Fourth and Fifth Circuit position. But last time around, I noticed your argument about the massive retroactive liability, and I said, well, what about this provision that says someone who relies in good faith on the agency position doesn't have retroactive liability? Well, it's – I think the issue, I'm happy to discuss that, that's the portal-to-portal act affirmative defense. I think our reliance on that is even more complicated now, because it doesn't just allow for no damages when you've relied on the agency in the abstract. It specifically talks about relying on agency regulations. So at least since 2011, when you had the last change in administrative position, I don't think we'd be able to rely on the portal-to-portal act affirmative defense to say we're not subject to liability. The other thing my friends on the other side say is that, well, you know, there's this other exemption, 207i, that will help at least those that were paid on a majority basis for a commission. Now, there's a couple of things about that. I mean, I think the most important one is there's – I don't know the exact number, but there are a sizable number of people in the industry who are paid majority salary, and so they'd have to be restructured. But the other thing is it's a little bit rich for my friends on the other side to say don't worry about this because of 7i. I mean, when they filed this complaint, they must have had some theory as to why we weren't already covered by 7i. So I think that just shows that what the industry has relied on for four decades is not some combination of the portal-to-portal act and 207i. What the agency – what the industry has relied on is the idea that in this context, you know, it is this exemption that exempts all service advisors, not just those that are paid primarily on a commission. When I think of these three categories of workers, so service providers, partsmen, mechanics, to coin a couple of silly kind of words, a service advisor is customer-facing. You know, it's – the primary job is to deal with customers, to sell them things, to liaison with them, to make sure they're happy. Mechanics and also partsmen are car-facing. You know, their job is to do stuff with the car. And, you know, in different ways, the partsman is more helping, but their – their focus is on the automobile, whereas the service provider's focus is on the customer. That seems to me a pretty big divide, suggesting that the service providers are really, you know, salesmen, not servicers. Well, Your Honor, a couple of things. First of all, you probably anticipate that I'm going to take you back to the partsman again, because I do think describing the partsman as just vehicle-facing really misdescribes what they do. And I would ask you, if you have the time, to look at that 1966 entrance on the auto partsman counterman, because what it talks about is, you know, they really – sometimes they sell direct parts to retail customers, so sometimes they, too, are customer-facing. And that's all part of what they are primarily engaged in, which is not just facing the car. It's really – their responsibility is the parts, whether it's the mechanic that wants the parts for a particular repair or whether it's some outside customer who wants to buy a part because they're a do-it-yourselfer. Now – so I really think the partsmen are in the middle in a way that does really give servicing a broad compass. The other thing I would say is I don't think you can underestimate the degree to which these three occupations, especially in light of the way the industry has for decades, really do go together. There are many dealerships, as I understand it, who – essentially, the commission is a pot that is shared by the service advisors, the partsmen, and by the mechanics. They all work at some dealerships. They all get paid on a commission, and it all comes out of the same pot, which, of course, gets to the common sense of the matter, which is, if the service advisors don't do their job, there's not much of a job for the partsmen or the mechanics to do. There's no – there's no work to do if the service advisors – Everybody who's in a service department, does everybody count as primarily engaged in servicing automobiles who's in a service department, the receptionist, the filers? The answer is I'm not sure. I think probably not, but I also don't think it matters much because, of course, to be exempt, you not only have to be primarily engaged in servicing, you also have  So if you take somebody like a car porter, you know, are they primarily engaged in servicing? I think the definition of partsman is probably broad enough to say yes. You might disagree with me, but either way, they're not exempt. What about an automobile upholsterer? Again, I would say that that's somebody who might be primarily engaged in servicing, but they wouldn't be covered because they're not a mechanic, they're not a partsman, and they're not a salesperson. What role do the three objects at the end of the sentence play in your interpretation? We haven't discussed those yet. Well, I hope they play this role, Your Honor, which is I think it's common ground among the parties that those are distributed to each other noun gerund combination. So nobody's here saying, well, the first goes with the first when it comes to the object, so the only people that are exempt are the farm dealer mechanics. And I think that just shows, I mean, it would be really odd, anything's possible, of course, but it would be really odd if the way you read the statute is with the nouns vis-a-vis the gerunds, you apply this Redendo principle, but with respect to the gerunds vis-a-vis the objects, you apply the normal or means or principle. I think the real way to apply this statute, and honestly, I think what is the only thing that really ought to be left of the Redendo canon is the common sense principle that when you have these disjunctive series, if they combine in a way that really is something like the null set, you ignore it. You don't lose a lot of sleep over it, and it's fine because, you know, I'm not here to tell you there are mechanics who are primarily engaged in selling automobiles, but since there aren't any, you don't really have to lose any sleep over it, and you shouldn't construe the statute primarily based on the fact that there's a null set with one combination, especially when there's 100,000 flesh-and-blood examples of salesmen who are primarily engaged in servicing. What about our narrow construction canon? Well, that's an interesting question, Your Honor. I mean, you know, the Ninth Circuit applied that, and I suppose that, you know, the canon that the Ninth Circuit applied and the one it derived from one of this Court's older cases talks about being plainly and unmistakably within the exemption. Now, I'm a big enough believer in my argument here that I think maybe we even meet the plain and unmistakable test, but I also think, as we've urged the Court, that it may be time to put that canon to rest. And I'm not suggesting that the FLSA should be interpreted differently from any other statute. It's a general principle of statutory construction that exemptions are not construed to swallow the rule. I think that's a perfectly sensible rule of construction, but I do think to sort of amp that up to the degree that it is – has to be plain and unmistakable to come within the exemption really is contrary to the way this Court generally interprets statutes. I don't think it makes a lot of sense, especially if you remember that a lot of these exemptions are being passed much later in history than the 1938 enactment of the FLSA. So even if you accept the proposition that in 1938 Congress had an unalloyed interest in being remedial in the FLSA, I don't know why that would inform your interpretation of an exemption enacted in 1966 for the express purpose of at least having some employees not covered by the FLSA. And I do think that this would be an odd statute to have this plain and unmistakable test when it's riddled with exemptions. So if there were ever one statute where you'd say, okay, Congress, yeah, it had a very important purpose, it was a worthy purpose, but it didn't pursue it at all costs, it would be this statute. If you look at 213, which has the various exemptions to both the minimum wage laws and the overtime laws, as I counted up, there are 31 exemptions to the minimum wage and overtime laws just in 213, and there are other exemptions in other places in the statute. So what an odd statute to say that the way we're going to interpret this is only with a thumb on the scale in favor of the coverage and against the exemptions. If there are no further questions, I have reserved my time.  Thank you, counsel. Mr. Feldman. Feldman Mr. Chief Justice, and may it please the Court. The exemption in this case is for any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles. The most obvious reason why, or the clearest reason why service advisors don't come within that exemption is they don't service automobiles. In our brief, we cite five, I think the five most authoritative dictionaries of the English language, and they define service to service as to maintain or repair. You maintain or you don't maintain or repair a car the way people would ordinarily speak with a pad or a clipboard and a pencil or a telephone, which are the primary tools that service advisors use. You do it back in the back of the shop when you're actually working on the car. Service advisors don't do that, and therefore they don't service cars. They don't repair automobiles. Roberts Well, I guess sometimes, though, I mean, they do look under the hood sometimes, right? You bring the car up, you know, it's making this noise, they go out and at least listen to the noise, and sometimes they can say right away, oh, that's probably this, and then they send something down, and whether the customer is still there or comes back later, all that they do in the mechanics or the partsman, send it up and then plug it in, and it's right. So, I mean, in certain situations, the advisor would play the primary role in fixing the problem. Not when it's more complex, maybe not typically, but certainly in what I suppose would be many occasions. I don't think so. I mean, actually, I think what the advisor does is make a guess, but really of what might be wrong based on what the customer says. I mean, sometimes the customer goes in and says, I want a 20,000-mile servicing, and the service advisor just sends it back and says, we need a 20,000-mile servicing. Now, maybe the mechanic will find something, but even with the car, it's not a problem. Roberts Sometimes, I guess what I'm saying, sometimes the primary decision in servicing the car is going to be made by the service advisor, at least the initial thing. You know, send something down. The mechanic may well look at it himself or herself, but the service advisor says it's a distributor cap or whatever, and it turns out it is. They put it on, and it's done. Kneedler I think, actually, the service advisor's job, they may make a guess as to what's wrong and give the customer, say, well, it might be a distributor cap. But it's up to the mechanic to actually figure out what's wrong, not the service advisor. Kennedy Suppose the service advisor meets the customer in the morning, and he said, I'm a service advisor. I'm here to supervise and to plan the servicing of your automobile. Is that correct for him to say? Kneedler Well, actually, I don't think so. I don't think they supervise the servicing of the automobile. I think they serve a communications function. They don't, in any sense, supervise the mechanic. Kennedy Well, how about to arrange for? Kneedler Yes, I think it is correct to say they arrange for it. But I think there's a huge difference between the two.  But if that's true, it seems to me he's engaged in servicing the automobile. Kneedler I don't think so, because I think there's a huge difference. As a matter of he's definitely not servicing the automobile just because he's arranging for it. There's many people who arrange for the provision of services, but don't perform the service themselves. If somebody's – well, to take the example of some salesmen, this is particularly true of the difference between sales and service, which are pretty much two distinct categories. If somebody's going door to door and selling house painting services, says, you know, do you want your house painted, that person is selling and maybe arranging for painting the house, but they're not painting the house. If somebody's at a travel – Kennedy But if they picked out the color and advised all about the quality of the paint to use and different costs, and scheduled the timing and so forth, I think they could be – they could be supervising the painting of the house. Kneedler Right. Well, I mean, actually, supervising a repair also isn't the same thing as repairing. But I do think that it's quite clear, and you can look at the machinist brief, these people in no sense supervise the mechanics. They tell the mechanics what the problem is and what the customer wants, and it primarily serves as a communication link. It's up to the mechanic or whoever else is working on it in the back to figure out what to do. Roberts Well, but I mean, just – and maybe this isn't the best guide to the interpretation, but it's sort of common understanding. If you, over several years, drop your car off whenever you're supposed to or whenever it's broken, and you talk to Fred about getting it fixed, and somebody comes to you later and says, I've got a problem with my car, you would say, my service guy is Fred. Go see him. It's just sort of your general reaction is that is part of the service. Not only that, it's the part that – the only part that you have experience with. But you would think of Fred as the person who services your car. Kneedler I would just respectfully disagree. I actually think you would think of Fred as the person you give the car to. The person to service is to maintain a repair, and the person in the back who actually works on the car is the person who services the car. Breyer I can read it that way. I have no doubt that might even be the most natural reading. Suppose the word were involved in instead of engaged in. Kneedler Involved in would bring it much closer in. Breyer Yeah, it would. And so what we're doing is we're trying to parse the difference between engaged in and involved in in a fairly technical statute involving one of 40,000 different kinds of workers as part of a very general statute. Now, that to me rings a bell, that if this isn't a question for an agency, what is? Now, all right. So if I'm thinking that and maybe no one else is, I'm only speaking for myself. I was sort of surprised that nobody in the Ninth Circuit referred to a doctrine that nobody refers to anymore. It's called primary jurisdiction. And it can be used to ask the relevant department to file a brief. And nobody did that. Now, suppose I think, gee, I don't know the answer to this question. It's highly technical. I do look to purpose. The purpose apparently was that they put these mechanics in there because they had farm equipment somewhere that people go in the middle of the night so they didn't have fixed hours. Whether that was so or not, I don't know. And maybe the service person would call it 2 in the morning and tell the farmer he's coming, in which case he doesn't have fixed hours. So he should be exempt, too. I don't know. So suppose I start. You see the attitude. Have you any advice for me at all? Banner. Yeah, I do. In the first place, if you look at the car dealership, it's not the case that there are three main people in the car dealership, the salesman, the partsman, and the mechanics. There's salesmen who sell financing, insurance, and warranties. They're not cars. There's salesmen who sell underbody coatings and other accessories like that. There's lube technicians. There's body people who work on painting, on upholstery, on body repairs. There's car jockeys. There's dispatchers who allocate the work. So there's many different people who work at a car dealer. Congress picked out only three, and they picked out those three for a particular reason. And if you look at, actually, the things that we cite, all three of those share something in common. And service advisors not only don't share that, but have a different quality that makes them much more likely to be in the staff. Well, if the mechanics are in there because they did call farmers at 2 in the morning, did the service advisor call the farmer, too? As far as I know in the history of the auto industry, there's never been an example of a service advisor who worked off-site and probably very rarely, if ever, for irregular hours. Those were the keys to why Congress wanted partsmen and mechanics in there. They're also clearly the most important reason why they wanted salesmen in there, because salesmen in those days, and still today at luxury dealerships, I'm told, salesmen will come and bring the car to you to go take a test drive. And car salesmen seem to be more likely to work off-site than salesmen in the factory. Ginsburg. But Congress got it wrong in what they perceived the partsman job was. They were right about the partsman who worked on farm equipment, but they were wrong about the partsman who worked on automobiles, who worked regular hours. I don't think they were wrong. I think what they decided is they wanted to include partsmen and mechanics, who I think reasonably are both said to be servicing cars, and they then decided to include the whole categories and not just limit it to farm implements or a particular kind of mechanic or partsman, as long as they're servicing cars. That was the limitation. Kagan. But your definition of servicing, which I think is a very natural one, I mean, and not just, you know, natural, it's the dictionary definition of servicing, but it has to cope with this partsman word. How does – how do partsmen fit within your definition of servicing? Well, I do – I think partsmen are reasonably said to be servicing cars. If the mechanic is – needs a fan belt, is working on a car, and walks over two steps or five steps or ten steps to pick a fan belt off the wall, bring it back to the car, I think the mechanic is that whole time repairing or maintaining the car. And what the partsman is doing is taking over a function – one part of the function of what the mechanic does, and instead the partsman's doing it. And that's why it works very closely, as we talked about in the brief, they work very closely with mechanics. They try to get the parts to them in the order in which they need them on complex repairs and so on. And I think that it's very reasonable to – and I guess also a car is nothing but the sum of its parts. And for all those reasons, I think it's very reasonable to say that they are servicing cars. But – Well, but diagnosis is part of the servicing as well, and the service advisors at least do that. I mean, the mechanic doesn't go into know what the – he needs to know what the problem is. And the service advisor will spend a fair amount of time trying to get a description from the customer. Sometimes it's easy, you know, the car won't start. Other times it's going to be harder, and they need to get a good description. You know, is the person who takes down your symptoms at the doctor's office before the doctor comes in, is she or he part of the medical treatment? I think actually the relevant question is, is he or she providing the treatment? And I would say no. They're giving an initial guess. No, no. The statute talks about being engaged in. So is that person engaged in the medical treatment? I don't think he's engaged in treating. He's maybe a part of the process. I guess maybe it's a – But the dictionary definition of engaged is to do or take part in something. Right. And, you know, as far as engaged in goes, this Court has – I mean, actually it did a Lexis search, and this Court has used the term 500 times. It's used about 2,000 times in the U.S. Code. It's used in the FLSA, in actually one of the provisions in 213d in the same statute. It's engaged in the delivery of newspapers. It's an extremely common word. And I can't find any instance in which any court has ever construed it to mean anything other than what Black's Law Dictionary says, which is to do something customarily or regularly or continually. It doesn't mean doing something that's ancillary to that activity. So if you're – 203d talks about engaged in the delivery of newspaper, and there's an exemption for people like that. If you're calling somebody up on the phone and saying, would you like your home delivery of your newspaper, I don't think that person is covered under that provision. And if this Court were to construe engaged in to be a term of breadth like that in this case, I think it would actually upset a lot of settled expectations across broad areas of the law. When Congress wants to include, wants to broaden out a term, it uses terms like necessary and consequent and necessary to, which – I'm sorry, necessary and incidental to, which it uses in a couple of the FLSA provisions that we cite, or it uses terms like the process of, which it uses regularly throughout the U.S. Code. But I don't think there's any basis to take in this statute, which is very actually carefinely written, to take the word servicing or engaged in servicing and say, well, no, no, they mean something like in the criminal law you might say someone is an accessory before the fact if they help the crime before it's committed or after the fact if they help it afterwards. I don't think – but in the criminal law, actually, if you didn't have 18 U.S.C. Section 2, which made those people liable as principals, they wouldn't be liable for the crime. And I do think it's the same principle here. When they're talking about engaged in servicing, they're talking about the people who service, not the people who I would concede do things that are necessary and incidental to the servicing. There is many people who do that. Kagan Mr. Feldman, when you talked about the purposes, you focused on the fact that service advisers work onsite and don't work irregular hours. I believe that Mr. Clement's argument, and he'll correct me if I'm wrong, focuses on the fact of commissions, that these people, like other kinds of salesmen and like mechanics, are often compensated through commission schemes. What about that? Mr. Feldman I think that commissions are actually completely irrelevant to this provision. There's many other people at the car dealership, including many of the ones who I mentioned, who are paid on commissions who are not exempt. There's many people at car dealerships and throughout the economy who are exempt and who are not paid on commissions. In fact, where Congress was interested in commissions as a basis for an exemption, they provided one in 207i. If you're paid more than 50 percent on commissions and you make more than one and a half times the minimum wage, then you can get you can be exempt under that provision. It is possible that at least going forward, and I would correct my friend, at the time of the complaint, one thing that was true here, or that's alleged in the complaint, is that the dealership was not up until recently, it says, keeping track of the time and the hours spent. So actually, they would have had a hard time keeping track, even though they are required by law to do that, they would have had a hard time keeping, making out the 207i exemption. But going forward, it may be in this case that these people are covered by 207i. You know, as far as the reliance interest that my friend mentioned, I actually think the reliance argument cuts exactly the other way. When this Court had the case before, the question that the Court said it was concerned with about reliance was whether the people had been relying on the 1978 D.O.L. letter and whether the agency in 2011 was required to give some explanation of why it changed its mind. That's actually so that question is no longer in the case. The regulation, the Court said, is not controlling here. But what has happened is in 2011, D.O.L. did tell everybody that it thought service advisors are not exempt from the are not exempt. And in 2015, the Ninth Circuit decided the case. In 2016, about two years ago, this Court remanded the case to the Ninth Circuit. By that time, and long before that, probably from 2000, in fact, I know from 2011 on, dealerships were being informed that service advisors might well be covered here and that there is they might, you might, they might be entitled to overtime. Kennedy, could you add to that, or correct me if I'm wrong, that in the two circuit cases that ruled against the FLSA, the government had taken the opposite position? That's right. That's right. But I think my point about reliance is if you actually, there's a two-year statute of limitations here. Everybody's known since 2011, and certainly since two years ago when this Court decided the case last time, that these people might be entitled to overtime. As far as I can tell, there's been two cases at most, and I'm not sure about both of them, one in the District of Arizona and one in the Western District, I think it's the Western District of New York, that have been filed claiming that service advisors are entitled to overtime. That's it, two cases. So I think the logical inference to be drawn is that most dealerships, some dealerships are probably paying overtime right now to service advisors. In fact, I know that some are. Some dealerships, many, many dealerships, probably the vast majority of them, have made, have arranged things so they come within the 207i exemption. And the reliance now, what really is, what this case easily could be about is whether dealerships can stop paying overtime to people whom they're currently paying, and whether dealerships can change the terms of their arrangements with service advisors so that the people who have been coming under 207i, they can, they don't have to comply with the limitations of 207i, they don't have to comply with the minimum, one-and-a-half  Ginsburg-Gilmour. I don't understand from what you said whether you are disagreeing with me that there would be no retroactive liability because employers relied in good faith on what had been the agency's position. I agree with you there would, there could be good faith reliance. In this case, I think there would be good faith reliance up until 2011. Then the complaint here was filed in 2012, so we could only go back as far as 2011. There would be good faith reliance. But the point is, that isn't going to be relevant to future cases. There's only two cases, I think. As far as I'm aware, maybe there's another one that I haven't been able to find, but I've tried to look for them. There's only two cases currently pending. But I think really the Court should be very careful about giving a lot of weight to claims of reliance, where what well might be happening is people are paying overtime and bringing their service advisors in 207i, and what they really want to do is stop paying the overtime and stop bringing their service advisors within 207i. And so I don't think the reliance issue that my friend discussed, I just don't think that's a reason to decide the case that way. Kagan Mr. Feldman, the Solicitor General is not here in a case in which one would expect the government to be here. Do you know whether there's any activity taking place in the Department of Labor with respect to this issue? Feldman I don't know. I just don't know about that. I would make one other point about the purposes of the statute. So one of them was these three people, and especially auto salesmen, which is where what Petitioner says the service advisors are. The three categories of Congress included are people who work irregular hours and off-site where it's hard to keep track of people's hours. Now, the service advisors have a different, another feature. First of all, they never work off-site. They rarely work irregular hours. But there's another feature of how they work that cuts in the opposite direction. The complaint in this case alleges that service advisors, the service advisors in this case work 55 hours a week. Now, what Congress wanted to do in the Fair Labor Act was to set minimum standards of working conditions. And at the very least, they did, they thought that should be 40 hours a week and that should be basically what people are expected to work. Now, mechanics and partsmen, as well as, you know, warranty salesmen, lube technicians, all the other people at the auto dealership work an occasional overtime hour. But these people, this is their standard week after week, regular hours, 55 hours. Congress wanted to, Congress and the FLSA thought that that was, that was the kind of thing they didn't want to have happen. And particularly because there was a second purpose of the maximum hours of the overtime requirement, which is they wanted the people who are, instead of employing somebody for 55 hours, they wanted to say, well, go hire somebody else to fill in that extra time. Because they wanted to expand employment opportunities at the same time as they were, you know, legislating in favor of. JUSTICE KENNEDY If you have a service advisor in the morning and then a different one in the afternoon, that's a completely different, a changed dynamic from the same person saying, we found a little problem and we went ahead and did X, Y, or whatever. MR. CLEMENT Well, I mean, I just would say, one, is that does happen sometimes. Two is, another way to deal with this is to have fewer days worked and you can have longer hours. There's many occupations that work that way. You can share the work around. You can give people time off in the middle of the day. Okay. This dealership doesn't do any of those things. It's a 55-hour week. And that's exactly the purpose of the FLSA. These are people who come directly within the purposes of the FLSA, and it's no coincidence that Congress didn't include them in the statute when it included salesmen, partsmen, and mechanics. Another, I would say also that Petitioner's argument is primarily, is that service advisors are salesmen. And actually on page 5 of the reply brief, Petitioner says, they're salesmen because they are principally involved in selling, and that's what you would expect salesmen to do. But that does create a logical problem for Petitioner, because if you're principally involved in — you can't be principally involved, or it's hard to be principally involved in two different things, especially two things as different as selling and servicing. So if they're principally involved in selling, which is what Petitioner says makes them a salesman, and I think what would make them a salesman if they were, then it's impossible to say that they're — then it's hard to turn around and say, no, no, they're principally engaged in servicing. The two categories are distinct in the statute, and as examples I gave of the house painter or the travel agent who's selling guided tours, you know, or a AAA person who's selling you roadside assistance, all those people are selling you things. They're not doing them, because the idea of selling something is a fundamentally different concept than the idea of actually doing it. And that's a problem that I don't think Petitioner can escape. I mean, that is the reason why what Congress did is they put service advisors with all the other people in the auto dealership who I mentioned who are not exempt and who get overtime. I think even Petitioner doesn't actually believe, at least in one respect, that service advisors are principally engaged in selling — in servicing automobiles. There are people at the dealership who sell underbody coatings and assorted paint sealants, upholstery treatments, tire treatments. Those people are definitely salesmen. That is, their job is to sell. Those things are all services that are provided to the car, and yet Petitioner has conceded from the beginning of this litigation that those people who do that kind of selling, that they're not covered by the statute. And I think that just is a natural conclusion that Petitioner draws, because I think that's the natural way to read the statute. Petitioner, my friend did refer to the — said that the Department of Labor has taken the position that auto — that autobody repair people are not covered by the statute. I think that that is actually mistaken. The only source for that is in a footnote in the reply brief. It's a 1968 opinion letter by the Department of Labor. And what the Department of Labor said there, first of all, the opinion letter stood for the proposition and addressed the question of whether auto painters are covered by the statute, are exempt, and included that they're not exempt. But secondly, it did then talk about a category called body and fender mechanics, and it suggested that they are not — that they are exempt under the statute. Well, I just think it's worthwhile looking at what happened to that. In 1970, body and fender mechanics were included in the original version of the regulation as an example of the kind of people who are considered to be mechanics and could be exempt. In 1973, three years later, I think it was the first revision of it, they kept the list of people who are mechanics the same and removed body and fender mechanics. So I think the only thing you can conclude is the Department of Labor has not concluded, and there isn't a history of saying that even body and fender mechanics are not covered. But whether they're covered or not would be a different question, but at least auto body repairmen are not. Congress picked three distinct professions who were well-recognized at the time of the statute and said, you know, we want those occupations, specific occupations, to be exempt for the reasons that I said. The service advisors were a well-recognized occupation at that time. They were recognized in the Occupational Outlook Handbook. They had been recognized in NLRB decisions from the 1940s on, in industry publications. And there's a reason why they're a distinct occupation, because if you look at the jobs that they do, it's actually a completely different job than the job that's done by auto salesmen, who are the people who Congress undoubtedly wanted to include. The one other thing I'd like to say is about the distributive or redendo canon. I mean, we don't we the what that canon stands for is the proposition that when you have two lists like this that you have to make match up as as dates as as in the Sims case is actually a great example, where you have three in the first category and two in the second, and you have to match them up. It is common, and there are ORs, they're connected by the word OR. It's common in English language to say, well, we'd match up the ones that actually fit according to the context, but we don't have to struggle and strain to twist with the ordinary meanings of words or something like that to try to barely find a way in which everything in the first list has to match with everything in the second. And that is all that that canon means. It means that it's perfectly acceptable and was what Congress, I think, did, is to say salesmen match up with sales. They're etymologically related. They're semantically related. That's what Congress intended to do, and it matches perfectly. Parchment and mechanics match up with servicing. Salesmen don't match up with servicing, and in fact, insofar as someone's a salesman, they're almost certainly not a service person. If there are no further questions. Roberts. Thank you, counsel. Five minutes, Mr. Clement. Clement. Thank you, Mr. Chief Justice, and may it please the Court. Just a few points in rebuttal. First of all, I'd like to start with the reliance issue. I don't think it is factually accurate at all to say that when the 2011 regulation came in, without any explanation, that was ultimately deemed procedurally invalid by this Court, that dealerships just stopped what they were doing and changed 40 years of practices. If that had happened, this suit would not have happened. I mean, the reality is that across the country, based on that unexplained regulation, dealerships continued their traditional practices. That's why the reliance interests are all on our side of this case. Now, there are also reliance interests for the treatment of body repairmen, who have from the very beginning been treated as exempt at dealerships. Now, there is the letter that we cite that talks about how painters are not covered and body repairmen are covered. It also cites legislative history. I'll grant you the legislative history is more focused. Mr. Clement, your new definition, your more expansive definition, tell me how much many more people that are involved in the service department will be covered? Will it include the dispatchers who tell people, who don't do anything but assign the work, but the lubesmen, the upholsterers, all those other people who right now for 40 years, or more or less, have been paid a salary, are they now going to be  Is that your new definition, we can forego paying them minimum wages? Clement, No, Justice Sotomayor. We're here for the status quo team. We don't, we're not trying to get some change. Sotomayor, Well, that's very nice, but tell me, but your definition, your definition might very well include them. Clement, It might. Sotomayor, Because you're basically saying anybody involved in servicing is covered. Clement, No, that's where, that's where, with all due respect, you're wrong. We're giving you a definition of servicing, but we also say it works in the statute together with salesperson, partsman, and mechanic. So in order to be covered, you have to be both. You have to be one of those three categories of employee, and you have to be primarily engaged in servicing. So nothing's going to change for the non-mechanics, the non-salespeople, the non-partsman. Things are going to stay the same because we have, we have a definition of servicing that has to include partsmen, that includes service advisors, and service advisors are primarily engaged in servicing, but because they are also salespeople. So I just wanted to say that the legislative history is specific as Defender and Bodymen. They were meant to be exempt mechanics. They're treated as exempt. I hope we don't have another change to deal with. Under the status quo, body repairmen are exempt, mechanics, traditional mechanics are exempt, partsmen are exempt, and sales advisors are exempt, and there are real reliance interests on that. As to the Labor Department's position, they're obviously not here. Footnote 9 of our reply brief points out that they have put an advisory out that they are not going to take any enforcement actions against sales advisors until this Court rules in this case, which I think just underscores that the reliance interest, the status quo is in our favor. There's no current regulatory effort to go after service advisors. And there really hasn't been one from the Labor Department itself since about 1978. And, Justice Breyer, if you're looking for a tiebreaker with an agency somewhere, I think it's four decades of acquiescence. That's the last valid action from the Labor Department. The 2011 regulation was deemed procedurally invalid. So the last word for them is 1978 opinion letter, 1987 enforcement manual. For 40 years, everybody has understood service advisors to be exempt. Whether you think about that as an indictment. Kennedy, were there two circuits that ruled in favor of the employees? Was that within the 40-year period? Did the agency take the position in those two cases? That Justice Kennedy is really what starts the 40 years of reliance. So the first of those cases was a Fifth Circuit case called Deal Motors. That was an enforcement action brought by the Labor Department, but the Labor Department lost. Shortly thereafter, they also lost in the Sixth Circuit, and that's when they started acquiescing. The Fourth Circuit case comes along later, and that's a private party action. It's not an enforcement action. So we do have, you know, roughly at least since 1978, we've had acquiescence from the Labor Department, which gives rise to all of these reliance interests. In terms of the purpose of the statute, I really thought it was interesting that my friend on the other side emphasized the fact that the service advisors worked 55-hour weeks, because Congress, when it dealt with people who, by the nature of their job, worked long weeks, they had one of two reactions to that. One of them, they said, well, that's awful and we want to have more workers, so we're going to limit them to 40. The other is, they said, well, yeah, that's the way it is in that industry, and those people aren't underpaid, so we're going to give them an exemption. That's exactly what they did with service advisors. Thank you. Roberts. Thank you, counsel. The case is submitted.